# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Nan R. Nolan | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 98 C 7829 | **DATE** | 11/20/2000 |
| **CASE TITLE** | | EEOC vs. United Air Lines | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ■ Status hearing set for 12/7/2000 at 10:00 A.M.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order: Defendant United's motion for summary judgment [18-1] is granted in part and denied in part.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | **Document Number** |
| | No notices required. | number of notices | |
| ✓ | Notices mailed by judge's staff. | | |
| | Notified counsel by telephone. | NOV 21 2000 date docketed | |
| | Docketing to mail notices. | | 32 |
| | Mail AO 450 form. | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | |
| KMc | courtroom deputy's initials | date mailed notice | |
| | Date/time received in central Clerk's Office | mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES EQUAL EMPLOYMENT OPPORTUNITY COMMISSION | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | No. 98 C 7829<br>Magistrate Judge Nan R. Nolan |
| UNITED AIR LINES, INC., | ) ) | |
| Defendant. | ) ) | |

DOCKETED

NOV 21 2000

## MEMORANDUM OPINION AND ORDER

Plaintiff United States Equal Employment Opportunity Commission ("EEOC") brings this action against United Air Lines, Inc. ("United") on behalf of Mary Hermann ("Hermann") under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq, alleging that United failed to reasonably accommodate Hermann's disability, Temporomandibular Joint Disorder ("TMJ"), during her employment at United and constructively discharged her. United has moved for summary judgment. The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons explained below, United's motion for summary judgment is GRANTED IN PART and DENIED IN PART.

## I. FACTUAL BACKGROUND[1]

### A. **Mary Hermann**

Hermann was employed at United continuously from September 1973 through May 5, 1994. EEOC's Rule 56.1(b)(3)(A) Statement ¶ 3. With the exception of two short periods in other United

---

[1] The following facts are taken from the parties' Local Rule 56.1 Statements and exhibits and are undisputed unless indicated otherwise.

32

departments, Hermann worked the last 16 years of her employment at United in the Accounting Department, Finance Division. Id. ¶ 4. At the time she left her employment at United, Hermann held the position of Account Controller and worked with the company's PassPlus Program in the Accounting Department. Id. ¶ 6.[2] Hermann was given the responsibility to operate PassPlus in 1991. Id. ¶ 8. Hermann's duties included talking to customers on the telephone, investigating and answering customer questions, and completing data input and program paperwork. Id.

**B.**    **Temporomandibular Joint Disorder**

Hermann was diagnosed with TMJ, a condition caused by repeated gritting and grinding of her teeth, in early 1991. Id. ¶ 13. Hermann experienced various aches and pains in her jaw, ear, head and neck. Id. To alleviate the symptoms, Hermann wore a mouthpiece and had braces applied. Id. Hermann missed little time from work and remained fully able to perform her job duties in PassPlus. Id. ¶ 14.

In July 1992, Hermann first saw Dr. Lawrence Lagrotteria. United's Resp. to EEOC's Local Rule 56.1(b)(3)(B) Statement ¶ 1. A noted dated January 28, 1993 from Dr. Lagrotteria informed Dick Rooney, Hermann's supervisor in PassPlus, that Hermann underwent a bilateral arthroscopy on January 21, 1993. Rooney Dep. Exh. 1.[3] Dr. Lagrotteria requested that Hermann be allowed time off work until February 1, 1993. Id. Dr. Lagrotteria did not place any restrictions on Hermann's

---

[2] PassPlus is a customer program that allows passengers to purchase a "bank" of flight miles for a discounted fee. EEOC's Local Rule 56.1(b)(3)(A) Statement ¶ 7. PassPlus participants are among the largest customers at United in terms of miles flown and dollars spent. Id.

[3] Other than Dr. Lagrotteria's January 28, 1993 note, Hermann never provided her supervisors in PassPlus with doctors' notes or documentation regarding her TMJ symptoms. EEOC's Local Rule 56.1(b)(3)(A) ¶ 70. The EEOC points out that neither of her supervisors in PassPlus ever asked Hermann for any additional medical information. Hermann Dep., pp. 535-36.

ability to return to work and did not mention her TMJ, her symptoms, or her ability to work in PassPlus. Id. The surgery did not relieve all of her problems due to the TMJ. EEOC's Local Rule 56.1(b)(3)(A) Statement ¶ 6. Hermann continued to have a recurrence of her symptoms after the surgery. Id. ¶ 7. After a short leave, Hermann returned to work in PassPlus and immediately resumed all of her duties, except for phone work, which she resumed one week after her return. Id. ¶ 16. By mid-February 1993, Hermann was able to perform all of her assigned duties in PassPlus, including telephone work. Id.

C.     **Hermann Transfers to United's Reservations Department**

By March 1993, Hermann believed that the volume of work demanded by her PassPlus job was more than she could handle. Id. ¶ 9. When additional personnel were not hired as Hermann requested, she voluntarily transferred to the Reservations Department in May 1993. Id. ¶¶ 10, 11, 17. Rooney completed the transfer request form on which he indicated that Hermann's performance was acceptable and she could fully meet the demands of the job. Id. ¶ 18. On the form, Rooney explained that the nine days Hermann had been absent in the prior 12 months was related to oral surgery. Id. Hermann understood that the Reservations job involved talking on the phone for eight hours a day, 40 hours a week. Id. ¶ 19. Between May 1993 and November 1993, Hermann worked in the Reservations Department without a single absence or incident. Id. ¶ 20.

In November 1993, Hermann experienced a recurrence of her TMJ symptoms which she reported to her direct supervisor in the Reservations Department, Carolyn Schoeneman. Id. ¶ 21. Schoeneman immediately offered and Hermann accepted a decreased work schedule of a six-hour day. Id. The new schedule did not alleviate Hermann's symptoms. Id. After the recurrence of her TMJ symptoms, Dr. Lagrotteria suggested Hermann find alternative work which did not require her

to constantly speak on the telephone for the entire eight-hour work day. Id. ¶ 22. On November 25, 1993, Dr. Lagrotteria wrote a letter to Schoeneman stating that Hermann:

> has been diagnosed as having temporomandibular joint pathology associated with sharp, shooting earaches. Mary has been quiescent for a period of time with utilizing a splint and physical therapy. She is presently in an acute flare up stage. Attention may be needed in possibly changing her job position so that the present work which apparently may be having a negative influence on her jaw joints is eliminated.

Id. ¶ 23.

Thereafter, Schoeneman assigned Hermann to the "deaf" desk, where she communicated with deaf passengers by keyboard. Id. ¶ 24. Because of the scarcity of deaf passenger communications, the deaf desk operator also assisted as needed in notifying passengers via telephone of flight cancellations. Id. The "deaf" desk operator job failed to eliminate Hermann's symptoms. Id. Schoeneman then suggested that Hermann take a leave of absence under the Family Medical Leave Act ("FMLA"), during which time United would locate alternative work for Hermann. Id. ¶ 25. Schoeneman told Hermann that United would find an accommodation for her – a job requiring no telephone use. United's Resp. to EEOC's Local Rule 56.1(b)(3)(B) Statement ¶ 20. Schoeneman provided Hermann with an FMLA leave form titled "Certification of Physician or Practitioner" to be completed by Dr. Lagrotteria. EEOC's Local Rule 56.1(b)(3)(A) Statement ¶ 26.

Dr. Lagrotteria completed the form on December 23, 1993, and a copy was provided to Schoeneman.[4] When asked on the form whether Hermann was able to perform work of any kind, Dr. Lagrotteria responded that Hermann was able to work but should "avoid constant use of phone." Id. ¶ 28. Dr. Lagrotteria indicated that Hermann's diagnosis was "TMJ, pain with earaches and

---

[4] Hermann complied with every request for medical documentation that was made of her by United. United's Resp. to EEOC's Local Rule 56.1(b)(3)(B) Statement ¶19.

headaches." Hermann Dep. Exh. 12. Dr. Lagrotteria described Hermann's treatment regimen as follows: "Ongoing treatment during acute flare-ups including analgesics, splint therapy and physical therapy. Office visits as need for preceding earache and headache. Pain requires limited use of phones." Id. United granted Hermann a leave of absence. EEOC's Local Rule 56.1(b)(3)(A) Statement ¶ 30. Schoeneman submitted a reasonable accommodation form regarding Hermann to the personnel function in the Reservations department. United's Resp. to EEOC's Local Rule 56.1(b)(3)(B) Statement ¶ 25.

During her leave, Hermann contacted Verne Smith, Accounting Department Manager. EEOC's Local Rule 56.1(b)(3)(A) Statement ¶ 35.[5] Hermann contacted Smith to inquire about a vacancy in PassPlus. Id. Hermann informed Smith about her TMJ and that she had been on a leave of absence because her TMJ had flared up again. Id; United's Resp. to EEOC's Rule 56.1(b)(3)(B) Statement ¶ 22. Hermann told Smith that she was having headaches and dizziness. United's Resp. to EEOC's Rule 56.1(b)(3)(B) Statement ¶ 22. Hermann also told Smith that "United was trying to find [her] a job with no phones." EEOC's Local Rule 56.1(b)(3)(A) Statement ¶ 35. Hermann did not tell Smith that she could not physically speak on the phone or that any doctor had told her that she could not speak on the phone. Id. ¶ 36. Smith told Hermann, "Don't worry about the phones. There is plenty of people to handle the phones." Id. ¶ 37. Smith did not tell Hermann that if she returned to PassPlus, she would never have to talk on the phone. Id. ¶ 38. Smith agreed to take Hermann back into the PassPlus group. Id. ¶ 39. Hermann accepted the job and started in PassPlus

---

[5] Except for the short time Hermann spent working in other areas, between 1980 and 1994, Hermann reported, directly or indirectly to Smith. EEOC's Local Rule 56.1(b)(3)(A) Statement ¶ 4. Smith thought highly of Hermann and promoted her in June 1990 and again in January 1991 to higher level and higher paid jobs in the Accounting Department. Id ¶ 5.

in February 1994. Id. ¶ 40.[6]

### D.    **Hermann Returns to PassPlus**

When she returned to PassPlus, Hermann was assigned to handled the paperwork portion of

the PassPlus function. EEOC's Local Rule 56.1(b)(3)(A) Statement ¶ 41. Linda Dinaro was

assigned primary responsibility for answering customer telephone calls. Id. Rooney was Hermann's

direct supervisor in PassPlus. Id. ¶ 42. On her first day back, Hermann told Rooney that she "was

on the medical, and [] wasn't supposed to be on phones." Hermann Dep., p. 250. At the outset of

Hermann's return to PassPlus, Hermann shared a single phone with Dinaro. EEOC's Local Rule

56.1(b)(3)(A) Statement ¶ 43. Dinaro answered the phone if she was at her desk, but Hermann

testified that Dinaro often got up and walked away from her desk when the telephone rang. Id. Even

when Dinaro answered the phone, she often passed calls to Hermann. Id ¶ 44. Hermann felt that

she spent approximately half the day on the phone even when Dinaro was in the office. Hermann

Dep., p. 259.

United contends that Hermann was never asked, instructed, required or ordered to answer the

PassPlus phone, even when Dinaro was out. United's Local Rule 56.1(a) Statement ¶ 47. Hermann

testified that she was not ordered or instructed to answer the PassPlus phone. United's Reply to

EEOC"s Response to United's Rule 56.1(a) Statement ¶ 47; Hermann dep., pp. 218, 233, 253, 256,

------

[6] If a United employee completes a reasonable accommodation form with her supervisor and personnel representative in a particular department, such as Reservations, and the accommodation sought is a transfer to a different department, the personnel representative from Reservations is expected to have conversations about the accommodation with the employee's new personnel representative and manager. United's Resp. to EEOC's Local Rule 56.1(b)(3)(B) Statement ¶ 27. In Hermann's case, Guadalupe McDougald, the personnel representative for United's Accounting Department, did not have any conversations with Hermann's prior personnel representative, Rick Bolanowski, about her accommodation until after Hermann left her employment with United. Id.

258-59, 360, 508. Hermann further testified that she could have let the phone ring in Dinaro's absence. EEOC's Local Rule 56.1(b)(3)(A) Statement ¶ 48. Hermann never told any caller not to ask for her, that it was not her assignment to speak on the phone, or that she could not physically speak on the phone. Id. ¶ 49. Hermann did not instruct any co-worker not to transfer calls to her when callers requested her by name. Id. ¶ 50.

The EEOC contests United's assertion that Hermann was not asked, instructed, required, or ordered to the answer PassPlus phone even when Dinaro was out. Rooney testified that he expected Hermann to handle customer calls and concerns in Dinaro's absence. EEOC's Local Rule 56.1(b)(3)(A) Statement ¶ 47. Rooney further testified that when Hermann answered the phone on these occasions, he expected her to do more than take a message; he expected her to "handle the call." Id. Rooney stated that he also expected Hermann to respond to customer inquiries if Dinaro was on an extended call. Rooney dep., p. 47. Hermann assumed she was supposed to answer the PassPlus phone when Dinaro was not at her desk because Rooney directed her to "work hand in hand with [Dinaro]." EEOC's Local Rule 56.1(b)(3)(A) Statement ¶ 47. Rooney never explained to Hermann what he meant by "work hand in hand" with Dinaro and never told her it meant she had to speak on the telephone. Hermann Dep., pp. 507-08.

Hermann also testified that after her return to PassPlus, Rooney offered her a promotion to a Job Group 7 which would have required her to work alongside of Dinaro on the phones. Hermann Dep., p. 236. Hermann told Rooney she could not accept the promotion because she could not work on the phone. Id. Rooney responded: "[Smith] never told me anything about that." Id. Hermann did not accept the promotion. Id., p. 237.

At some point thereafter, Rooney called Hermann and another employee into his office and "ringed [Hermann] out" for incorrect information Dinaro had given to a customer. United's Resp. to EEOC's Local Rule 56.1(b)(3)(B) Statement ¶ 51. Hermann told Rooney, "I'm not even supposed to be on the phones." Id. Hermann testified that in response Rooney directed her to oversee Dinaro's work in the future. Hermann's Dep., p. 542.

In April 1994, a second phone was added to the PassPlus area and was placed on Hermann's desk. EEOC's Local Rule 56.1(b)(3)(A) Statement ¶ 51. Prior to the installation, Hermann's desk was the only desk in the PassPlus work area without a phone. Id. The request for the phone installation was issued before Hermann's return to PassPlus. Id. Hermann was upset by the second phone and asked Smith why a phone was placed on her desk. Id. ¶ 52. Smith told Hermann that the second phone was for "overflow." Smith reiterated that Hermann's job responsibilities were to handle the paperwork. Id. After the installation of the second phone, all calls to the PassPlus number continued to ring to Dinaro's line. Id. ¶ 53. Hermann never asked that the phone be removed from her desk. Id. ¶ 54. Hermann did not complain about the second phone to United's personnel or medical departments. Id. ¶ 55. No supervisor expressly asked, instructed, required, or ordered Hermann to answer the second phone. Id. ¶ 56. After the second phone was installed on Hermann's desk, Rooney called Hermann into his office and told her she did not look happy. United Resp. to EEOC's Local Rule 56.1(b)(3)(B) Statement ¶ 57. Hermann testified that she told Rooney, "Dick, you know I wasn't supposed to have a phone," and Rooney replied, "I didn't – Verne never told me that." Id.

In March-April 1994, Hermann experienced TMJ symptoms including dizziness, headaches, and earaches. EEOC's Local Rule 56.1(b)(3)(A) Statement ¶ 57.[7] Hermann believes the symptoms were primarily caused by the stress she experienced watching Dinaro answer the PassPlus phone. Id. Hermann felt that Dinaro's job training and job understanding were inadequate and her job performance was poor. Id. Hermann testified that Dinaro frequently handed calls over to Hermann to handle, walked away from the phone when it rang or left the phone off the hook. Id. During her employment, Hermann never told Smith or Rooney or anyone else at United of her concerns about Dinaro's performance, that she felt that she had to answer the phone to cover for Dinaro, or how her perception of Dinaro's performance affected Hermann physically. Id. ¶ 58.[8]

During the period February 1994 through May 1994, Hermann's TMJ symptoms did not prevent her from carrying out any of her daily activities outside of work. EEOC's Local Rule 56.1(b)(3)(A) Statement ¶ 62. She performed all the daily cleaning, vacuuming and laundry for her family. Id. She cooked dinner every night, ran errands, and attended her sons' bowling league. Id.

---

[7] Dr. Lagrotteria did not meet with or treat Hermann at any time between November 26, 1993 and June 16, 1994. EEOC's Local Rule 56.1(b)(3)(A) Statement ¶ 31. At no time in 1994 did Dr. Lagrotteria instruct Hermann not to speak or not to speak on the phone. Id. ¶ 33. At no time did Dr. Lagrotteria restrict Hermann to a certain number or duration of telephone calls in a single day. Id. ¶ 34.

[8] The EEOC points out that even though Hermann never told Smith of her concerns about Dinaro's performance, Smith was aware of Dinaro's performance problems. EEOC's Local Rule 56.1(b)(3)(A) Statement ¶ 58. The EEOC relies on McDougald's testimony that Smith told her that Dinaro did not like being on the telephone and that Hermann thought Dinaro was not doing her job in supporting customers. Id. McDougald also testified that Smith probably told McDougald that Hermann thought Dinaro was not answering the telephones. Id. Alleged statements by Smith contained in McDougald's deposition are inadmissible hearsay which may not be considered for purposes of summary judgment. Hearsay is unusable in summary judgment proceedings. Einsenstadt v. Entel Corp., 113 F.3d 738, 742 (7th Cir. 1997) ("[H]earsay is inadmissible in summary judgment proceedings to the same extent that it is inadmissible in a trial."). Even if McDougald's testimony were admissible, it does not dispute United's factual assertion.

Herman could not recall any activities that she was normally involved in that she could not do between February and May 1994. Id ¶ 63. During this period, Hermann's TMJ symptoms often forced her to go to bed early. Id. ¶ 64.[9] Hermann was able to visit with her family and occasionally spoke with a co-worker named Marissa on breaks. Hermann Dep., pp. 243, 248. Hermann also testified that during this period, she was able to make short calls to her children but would experience pain. Id., p. 369. Dr. Lagrotteria testified that phone use causes a worsening of symptoms for TMJ patients from the onset of phone use. Lagrotteria Dep., p. 159. During the three months Hermann worked in PassPlus in 1994, she missed one half day of work due to her health. EEOC's Local Rule 56.1(b)(3)(A) Statement ¶ 65. On that day, she told Smith she needed to leave due to a headache, and Smith granted her request. Id.

## E.   **Hermann Resigns**

In the first week of May 1994, Dinaro requested two days of vacation (Friday, May 6 and Monday, May 9) to visit her family. EEOC's Local Rule 56.1(b)(3)(A) Statement ¶ 74. Her request was granted. Id. Later that same day, Hermann also asked to take Friday, May 6 off as a vacation day. Id. Rooney told her he would consider her request as he tried to determine phone coverage for that day. Id. ¶ 75. Rooney eventually granted Hermann's request for the day off. Id. Hermann was scheduled to be back in the office on Monday, May 9 and Dinaro was scheduled to return to the office on Tuesday, May 10. Id. ¶ 76. This arrangement made Hermann very nervous. She did not

---

[9] The EEOC states that Hermann also experiences dizziness and nausea whenever she speaks for long periods of time. The testimony relied on by the EEOC does not support its assertion. At page 61 of her deposition, Hermann testified only that she experienced earaches and jaw aches in May, 1999 if she spoke "too much" at family parties. At page 369 of deposition, Hermann testified that during the relevant period, she could make a two-minute call to check on her children but would experience pain.

want to be in the office and responsible for the phone if Dinaro was out even though no one told her that she would have to answer every call in Dinaro's absence. Id. ¶ 77. The personnel representative for the Accounting Department, Guadalupe McDougald, testified that Hermann was expected to be at work on Monday, May 9 "covering the PassPlus Program, being on the telephone, [and] responding to customers' inquiries." McDougald Dep., p. 91.

On Thursday evening, May 5, the day before Hermann, Dinaro, Rooney, and Smith were all scheduled to be off, Hermann resigned effective immediately. EEOC's Local Rule 56.1(b)(3)(A) Statement ¶ 78. EEOC maintains that the "resignation" was a constructive discharge. Id. Hermann did not orally inform her direct supervisor, Rooney, or her manager, Smith, or anyone else at United about her immediate resignation. Id. ¶ 79. Rather, she left a letter on the desk of a co-worker to be delivered to Smith the following week. Id. At the time she left the letter, Hermann knew that, without her, PassPlus would not be covered on May 9, that Smith would not see the letter until May 9, and that United would have no opportunity to find a replacement for her in time to cover the PassPlus function. Id.¶ 80. Hermann did not call or otherwise contact Smith or Rooney or anyone else at United about her resignation between May 5 and May 9, 1994. Id. ¶ 91.

Prior to her resignation, Hermann did not seek reassignment or transfer from her PassPlus job to a different job or department, ask for a leave of absence, seek assistance regarding her TMJ or her PassPlus job from the United medical department or personnel department, contact or visit United's medical department, or ask her physician to speak with Smith, Rooney, or anyone else at United regarding her job in PassPlus. Id. ¶¶ 68, 69, 82-84.

### F.    **Hermann Attempts to Rescind Her Resignation**

Five days after her resignation, Hermann contacted McDougald and asked if she could rescind her resignation. Id. ¶ 93. McDougald told Hermann to contact her former manager, Smith. Id. Hermann told McDougald that she "couldn't be on the telephone, that she had a restriction for being on the telephone" and that she had filled out some form. United's Resp. to EEOC's Local Rule 56.1(b)(3)(B) Statement ¶ 29. McDougald requested a copy of the form and Hermann sent her a copy of the FMLA physician certification completed by Dr. Lagrotteria in 1993. Id. Hermann also informed McDougald that she had been "forced" to be on the telephone, that she could not be on the telephone, that she took the job in PassPlus because she thought it was not going to involve any telephone work, and that she just could not take it anymore. Id. ¶ 59.

Smith informed Hermann that she would have to address her request to rescind her resignation to his boss, Rick Juster, the Director of the Finance Division. EEOC's Local Rule 56.1(b)(3)(A) ¶ 94. Hermann wrote a letter to Juster explaining her resignation. Id. ¶ 95. McDougald, Juster, and Smith all discussed the possibility of returning Hermann to United. United's Reply to EEOC's Local Rule 56.1(b)(3)(A) Statement ¶ 92. After Juster received Hermann's letter, he directed McDougald to check into whether there was any paperwork reflecting Hermann having a reasonable accommodation. United's Resp. to EEOC's Local Rule 56.1(b)(3)(B) Statement ¶ 31. McDougald told Juster there was no paperwork. Id.[10] After Hermann resigned, McDougald asked

---

[10] It is undisputed that at the time Juster was considering Hermann's request to rescind her resignation in mid-May 1994, the accommodation paperwork had not been completed. United's Response to EEOC's Rule 56.1(b)(3)(B) Statement ¶ 32. According to United, since Hermann found the job in PassPlus on her own before Schoeneman started the accommodation process, the paperwork was not initiated until after she started her new job, and was not completed until months after Herman resigned. Id.

Bolanowski, the personnel representative for the Reservations Department, whether Hermann had an accommodation. Id ¶ 32. Bolanowski told McDougald only that Hermann had been on FMLA. Id. McDougald had never seen a copy of Hermann's reasonable accommodation form until immediately prior to McDougald's deposition. Id.

Pursuant to United's policy, employees who resign without providing notice are not recommended for rehire at United. Under that policy, Hermann's immediate resignation disqualified her for re-employment. EEOC's Local Rule 56.1(b)(3)(A) Statement ¶ 92. McDougald and Smith are not aware of any situation where an employee, disabled or not, was recommended for rehire or was allowed to rescind a resignation after quitting without notice. Id. ¶ 99. After reviewing Herman's letter and consulting with Smith and McDougald, Juster decided that Herman would not be allowed to return to United because he believed: (1) Hermann resigned without notice, knowingly leaving the PassPlus function unstaffed; (2) Hermann intentionally disregarded the needs of the PassPlus customers; and (3) Hermann quit in an unprofessional manner. Id. ¶ 96. Juster believed that Hermann's resignation without notice, demonstrated a total disregard for United's customers. Id. ¶ 97. In her letter to Juster seeking to rescind her resignation, Herman wrote in part: "I know you got the phone calls the one day, and I am sorry, but the question is was the problem so bad it couldn't wait until Tues.?" Id. Juster further believed that Hermann's statement reflected a poor attitude and commitment toward customers on Hermann's part. Id. Juster informed Hermann of his decision that the resignation would stand by letter dated May 30, 1994 Id. ¶ 98.[11]

---

[11] During her employment at United, Hermann was not involuntarily demoted, transferred, reassigned or disciplined. EEOC's Local Rule 56.1(b)(3)(A) Statement ¶ 85. Hermann never had her pay involuntarily reduced. Id. ¶ 86. United never denied Hermann a transfer, leave of absence, sick day or vacation day she requested. Id. ¶ 87. No one at United ever told Hermann that she had to quit, and Hermann was not terminated by United. Id. ¶¶ 88, 89.

## II. **DISCUSSION**

The ADA provides that an employer discriminates against a qualified individual with a disability by "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . ." 42 U.S.C. § 12112(b)(5)(A). To establish a prima facie case of failure to accommodate, the EEOC must show that (1) Hermann was disabled; (2) United was aware of her disability; and (3) Hermann is a qualified individual who, with or without reasonable accommodation, can perform the essential functions of the position she held with United. Feldman v. American Memorial Life Ins. Co., 196 F.3d 783, 789 (7th Cir. 1999).[12] United contends that the EEOC cannot establish that Hermann was disabled under the ADA.

### A.    **Whether Hermann was disabled?**

United argues that Hermann was not a qualified individual with a disability under the ADA in 1994. A "qualified individual with a disability" is defined as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). The ADA defines disability in relevant part as: "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12102(2)(A). Major life activities include "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R § 1630.2(i).

---

[12] United mistakenly contends that in order to state a failure to accommodate claim under the ADA, Hermann must also show that she suffered an adverse action as a result of her disability. The ADA prohibits an employer from taking adverse employment actions against an employee because of a disability and imposes an affirmative duty on employers to make reasonable accommodations for an employee who can perform the essential functions of the position with accommodation.

The EEOC contends that Hermann's TMJ substantially limited the major life activity of speaking. A person is substantially limited if the individual is unable to perform or is significantly restricted as to the condition, manner, or duration under which she can perform the activity as compare to an average person in the general population. 29 C.F.R. § 1630.2(j). While the ADA does not define "substantial," it generally suggests "considerable" or "specified to a large degree." Sutton v. United Airlines, 527 U.S. 471, 491 (1999). In determining whether an individual is substantially limited in a major life activity, courts consider not only the "nature and severity" of the impairment, but also the impairment's "duration or expected duration" and the "permanent or long term impact." See 29 C.F.R. § 1630.2(j)(2)(i), (ii) & (iii).

Whether Hermann meets the definition of a qualified individual with a disability is determined at the time the employment decision was made. Bay v. Cassens Transport Company, 212 F.3d 969, 974 (7th Cir. 2000); Weiler v. Household Fin.Corp., 101 F.3d 519, 524 (7th Cir. 1996). The EEOC alleges that United failed to reasonably accommodate Hermann when she returned to PassPlus in February 1994. Hermann resigned on May 5, 1994, and her request to rescind her resignation was denied on May 30, 1994. Therefore, the relevant time period is February through May 30, 1994.

Although it is a close call, the EEOC presented sufficient evidence to create a genuine issue of fact as to whether Hermann was disabled as defined by the ADA. Just prior to Hermann's return to PassPlus, Dr. Lagrotteria indicated that Hermann's condition was chronic and that she was able to work but should "avoid constant use of phone." Dr. Lagrotteria diagnosed Hermann with "TMJ, pain with earaches and headaches." Hermann Dep., Exh. 12. Dr. Lagrotteria also stated that the pain caused by Hermann's TMJ "requires limited use of phones." Id. When Dr. Lagrotteria stated that

Hermann should "avoid constant use of [the] phone," he meant that using the phone would cause Hermann problems from the onset of phone use not just after she had been on the phone half the day. Lagrotteria Dep., p. 158-59. Dr. Lagrotteria explained: "In my experience with patients who had similar problems was that phone use for patients created a worsening of their symptoms; not only from mechanical use of their jaw from talking, but also from the phone striking their joint many times and leaning against it, pushing against it." Id. Dr. Lagrotteria opined that Hermann would not be able to talk on the phone for half of an eight-hour shift without pain. Id., p. 158. Dr. Lagrotteria stated Hermann's TMJ would be best served by having a job that did not require telephone use. Id., p. 159.

Hermann estimates that she spent up to four hours each day on the phone when she returned to PassPlus. Herman dep., pp. 259, 556. According to Hermann, there were only a few days when she went home from work without an earache and headache. Hermann's Dep., Exh. 16. In March and April, 1994, Hermann experienced TMJ symptoms, including dizziness, headaches, and earaches. EEOC's Local Rule 56.1(b)(3)(A) Statement ¶ 57. Hermann experienced pain when she made a "two-minute call" to her children from work and her TMJ symptoms often forced her to go to bed early. Id. ¶ 64. When she handled calls from irate customers, Hermann experienced stress and tension which caused her to grit her teeth and suffer from headaches and earaches. McDougald Dep., Ex. 5. When Dinaro took a vacation day, Hermann covered the PassPlus function and experienced an earache for two days thereafter. Id. On one occasion after she returned to PassPlus, Hermann had to leave work early because of a severe headache.

Viewing this evidence in the light most favorable to the EEOC, it presented enough evidence to raise a question of fact concerning whether Hermann was substantially limited in her ability to

speak when she returned to PassPlus. The EEOC has demonstrated the permanency of her condition and the headaches, earaches, and pain Hermann experienced with enough specificity that a reasonable jury could infer she was significantly restricted as to the condition and duration which she could speak as compared to the average person.[13]

## B.   <u>Whether United reasonably accommodated Hermann's disability?</u>

The determination of whether an accommodation is reasonable depends in part on whether it is effective, i.e., does it address the job-related difficulties presented by the employee's disability. <u>Vande Zande v. State of Wisconsin Department of Administration</u>, 44 F.3d 538, 542 (7th Cir. 1995). The EEOC contends that Hermann was not accommodated when she returned to PassPlus in February 1994 because she was expected to handle a great many telephone calls each day. United emphasizes that Hermann was never explicitly asked, instructed, required, or ordered to answer the PassPlus phones.

A genuine dispute of fact exists concerning whether the accommodation afforded by United was effective and reasonable. Rooney testified that he expected Hermann to handle customer calls and concerns in Dinaro's absence. EEOC's Local Rule 56.1(b)(3)(A) Statement ¶ 47. Rooney further testified that when Hermann answered the phone on these occasions, he expected her to do more than take a message; he expected her to "handle the call." <u>Id</u>. Rooney also stated that he

---

[13] Because the EEOC demonstrated a genuine issue of fact as to whether Hermann was substantially limited in her ability to speak, the Court need not reach the issues of whether Hermann is substantially limited in the major life activity of working and whether United regarded Hermann as disabled. 29 C.F.R. Pt. 1630, App. (stating "If an individual is not substantially limited with respect to any other major life activity, the individual's ability to perform the major life activity of working should be considered. If an individual is substantially limited in any other major life activity, no determination should be made as to whether the individual is substantially limited in working.").

expected Hermann to respond to customer inquiries when Dinaro was on extended calls. Rooney dep., p. 47. United maintains that Rooney's "expectations" regarding Hermann's phone use are immaterial because were not expressly communicated to Hermann. United ignores the fact that employer expectations may be communicated to an employee both directly and indirectly.

Circumstantial evidence considered in the light most favorable to the EEOC demonstrates that a material dispute exists which cannot be decided on summary judgment. Hermann told Rooney on several occasions that she was not supposed to be on the phone or to have a phone on her desk. Hermann Dep., pp. 231, 236, 250, 541. When Hermann repeatedly told Rooney she was not supposed to be on the phone, he did not respond by telling her that she was not required to answer the phone or asking her why she was answering the phones. Rooney's silence in response to Hermann's statements may have indirectly communicated an expectation that she answer the phone.

Moreover, Rooney directed Hermann to "work hand in hand" with Dinaro when Hermann brought up the subject of telephone coverage. Hermann assumed that Rooney meant she was supposed to assist Dinaro with telephone coverage. Rooney also told Hermann to "oversee" Dinaro's work. Hermann understood this comment to mean that Hermann was ultimately responsible for the PassPlus function. A reasonable jury could accept Hermann's interpretation of Rooney's comments. It is a jury's job, not the Court's job, to choose among competing but reasonable interpretations of a witness' testimony and to weigh and evaluate evidence.

Hermann's belief that Rooney expected her to answer the PassPlus phone when Dinaro was absent was confirmed during the first week of May 1994 when Rooney told her Hermann that he would consider her request to take May 6 as a vacation day as he tried to determine phone coverage for PassPlus for that day. Moreover, United refused to allow Hermann to rescind her resignation in

part because she left the PassPlus function unstaffed on May 9 and disregarded the needs of the PassPlus customers. A reasonable trier of fact could conclude from this evidence that United expected Hermann to answer the PassPlus phones on May 9 when Rooney, Smith, and Dinaro where absent.

In addition, Hermann knew that PassPlus customers are among the largest customers of United in terms of miles flown and dollars spent. Herman Dep., p. 184. The PassPlus phone rang constantly, and Dinaro would often get up and walk away from her desk when the phone rang. When Dinaro was away from her desk, none of the other co-workers who sat in the area would answer the phone. Hermann Dep., pp. 217-18. In light of these circumstances, Rooney's directions to Hermann that she "work hand in hand" with Dinaro and oversee Dinaro's work, and Rooney's failure to assure Hermann that she was not expected to answer the phone when she raised the issue, a conscientious employee could reasonably believe her duties included answering the PassPlus phone.

Granting the EEOC the benefit of the favorable inferences to which it is entitled at summary judgment, it may reasonably be inferred from the above evidence that United failed to provide Hermann with a job that did not require phone use and thus, failed to provide an effective accommodation.

## C.   <u>Whether Hermann was constructively discharged?</u>

The Seventh Circuit has recognized "the lack of authority as to whether a claim of constructive discharge stemming from a hostile work environment is cognizable under the ADA." <u>Miranda v. Wisconsin Power & Light Co.</u>, 91 F.3d 1011, 1017 (7th Cir. 1996). Rather than deciding whether a claim for constructive discharge exists under the ADA, the <u>Miranda</u> court held that even assuming it does, the plaintiff's claim fell "far short of what such a successful claim would require."

Id. The court noted that "in analyzing claims under the ADA, it is appropriate to borrow from our approach to the respective analog under Title VII." Id. The court then reiterated that a plaintiff claiming constructive discharge under must establish that the "employer 'made the working conditions so intolerable as to force a reasonable employee to leave.'" Id.

The EEOC has not presented sufficient evidence to create a triable issue of fact with respect to its constructive discharge claim. Not every failure to accommodate amounts to a constructive discharge. Rather, the EEOC must demonstrate that United made Hermann's working conditions so intolerable as to force a reasonable employee to leave. Accepting the EEOC's version of events, United failed to provide Hermann with a reasonable accommodation, a job with no phone work, Hermann experienced pain, including headaches and earaches, performing her job without an accommodation, and Hermann resigned because she would have been solely responsible for the PassPlus phone on May 9 and she feared increased future pain. The EEOC has not presented and the Court has not found any authority indicating that such actions amount to a situation so intolerable that a reasonable employee would be forced to leave.

The Seventh Circuit has found the following conduct intolerable and therefore sufficient to establish constructive discharge: (1) "a series of escalating sexual remarks [which culminated] in a physical death threat;" (2) a manager held a gun to a subordinate's temple, took a picture and then circulated the picture at a company meeting, stating "this is what a nigger looks like with a gun to his head;" and (3) a "subordinate's disputed sexual relationship with her supervisor [which] led to a suicide attempt." Simpson v. Borg-Warner Automotive, Inc., 196 F.3d 873, 877 (7th Cir. 1999) (citing Brooms v. Regal Tube Co., 881 F.2d 412, 423-24 (7th Cir. 1989); Taylor v. Western & Southern Life Ins. Co., 966 F.2d 1188, 1191, 1199 (7th Cir. 1992); Snider v. Consolidation Coal Co.,

973 F.2d 555, 557, 561 (7th Cir. 1992)). The Seventh Circuit has noted that the above cases involved work environments "posing grave threats to physical integrity." Simpson, 196 F.3d at 878. One worker received a pointed death threat, another was held at gunpoint, and the third attempted suicide.

While Hermann suggests that she resigned out of fears for increased future pain, no evidence in the record suggests that Hermann was in "similarly grave peril." Id. The EEOC's claim that Hermann suffered from "intense" and "excruciating" pain is not supported by the record. Hermann did not see her jaw surgeon the entire time she worked in PassPlus in 1994. She was able to satisfactorily perform her job in PassPlus and perform all of her usual activities outside of work despite her pain. On only one occasion after her return to PassPlus did Hermann's pain become so severe that she needed to leave work early. Hermann's working conditions were not so intolerable as to force a reasonable employee to resign. See EEOC v. Sears, Roebuck and Company, Inc., 1999 WL 977072 * 5 (N.D. Ill. 1999), aff'd in relevant part 2000 WL 1672612 (7th Cir. 2000) (holding former employee who had limited ability to walk failed to establish claim of constructive discharge where employer forced her to work on days when she was unavailable, denied her a reasonable place to eat, failed to provide a reasonable accommodation for her impairment, and management repeatedly yelled at and berated her).

Moreover, a constructive discharge claim "requires evidence that quitting was the only way the plaintiff could extricate herself from the intolerable conditions." Sweeney v. West, 149 F.3d 550, 558 (7th Cir. 1998); Rabinovitz v. Pena, 89 F.3d 482, 489 (7th Cir. 1996) (holding plaintiff "must seek redress while remaining in his job unless confronted with an aggravating situation beyond ordinary discrimination."). In the present case, Hermann did not adequately pursue avenues available for redress before she resigned. Hermann's only action after learning that she would be

solely responsible for PassPlus on May 9 was to resign without notice. She did not discuss her immediate concerns with Smith, Rooney, or anyone else at United. This is not what a reasonable person would have done to cure an allegedly intolerable working environment.

Resigning was not the only option available for Hermann. Hermann had worked at United for over twenty years. She had requested and received transfers to different jobs and departments. Hermann had also requested a reasonable accommodation in the Reservations department and received several accommodations, including a reduced schedule and a leave of absence. United never denied Hermann a transfer, leave of absence, sick day or vacation day she requested. Prior to her resignation from PassPlus, Hermann did not seek reassignment or transfer from her PassPlus job to a different job or department, ask for a leave of absence, or seek assistance regarding her TMJ or her PassPlus job from the United medical department or personnel department. Hermann did not contact or visit United's medical department. Hermann did not ask her physician to speak with Smith, Rooney, or anyone else at United regarding her job in PassPlus.[14]

## D.  **Whether United's failure to reinstate Hermann violated the ADA?**

The undisputed evidence shows that Hermann resigned from her position at United. Thus, to the extent that the EEOC argues that Hermann's request to rescind her resignation was a request for an accommodation, its argument must fail. The ADA requires an employer to make a reasonable

---

[14] The cases cited by the EEOC are easily distinguishable. Williams v. Bristol-Myers Squibb Company, 85 F.3d 270, 274 (7th Cir. 1996), simply indicates that a supervisor's threat of grave violence ("he'll shoot you unless you resign") satisfies the high standard for constructive discharge. Hermann was not threatened with grave violence or pain. The plaintiff in Goss v. Exxon Office Systems Co., 747 F.2d 885, 889 (3rd Cir. 1984), sought redress through her employer's "open door" policy which "only made matters worse, as she encountered hostility and intimidation tactics at each successive level of management." In contrast, Hermann did not seek any redress for her concerns regarding phone coverage on May 9.

accommodation; it does not require an employer to give an employee a "second chance." Siefken v. Village of Arlington Heights, 65 F.3d 664, 666-67 (7th Cir. 1995). The EEOC has not pointed to any authority holding that a reasonable accommodation includes reinstatement after resignation.

Finally, any suggestion by the EEOC that United's failure to allow Hermann to rescind her resignation states a claim for disparate treatment under the ADA fails. The EEOC has not presented any direct or circumstantial evidence indicating that United failed to allow Hermann to rescind her resignation because of her disability. It is undisputed that pursuant to United's policy, employees who resign without providing notice are not recommended for rehire. Moreover, neither Smith nor McDougald were aware of any situation where an employee, disabled or not, was recommended for rehire or was allowed to rescind a resignation after quitting without notice.

## III. CONCLUSION

For the reasons stated above, United's Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART. The parties shall appear for a status hearing on December 7, 2000 at 10:00 a.m.

ENTER:

Nan R. Nolan
**Nan R. Nolan**
**United States Magistrate Judge**

Dated: 11-20-2000

-23-